## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STATE OF ALASKA,                                    )
                                                    )
            Plaintiff,                              )
                                                    )
                and                                 )
                                                    )
ALASKA FOREST ASSOCIATION,                          )
                                                    )
SOUTHEAST CONFERENCE,                               )
                                                    )
ALASKA ELECTRIC LIGHT & POWER,                      )
                                                    )
ALASKA POWER & TELEPHONE,                           )
                                                    )
ALASKA MINERS ASSOCIATION,                          )
                                                    )
CITIZEN'S PRO ROAD,                                 )
                                                    )
ALASKA MARINE LINES, INC.,                          )
                                                    )
NORTHWEST MINING ASSOCIATION,                       )   Civil Case No. 11-1122 (RJL)
                                                    )
DURETTE CONSTRUCTION COMPANY,                       )
                                                    )
FIRST THINGS FIRST FOUNDATION,                      )
                                                    )
JUNEAU CHAMBER OF COMMERCE,                         )
                                                    )
CITY OF KETCHIKAN,                                  )
                                                    )
KETCHIKAN GATEWAY BOROUGH,                          )
                                                    )
SOUTHEAST STEVEDORING CORP.,                        )
                                                    )
CHRIS GERONDALE,                                    )
                                                    )
SOUTHEAST ROADBUILDERS, INC.,                       )
                                                    )
HYAK MINING CO., INC.,                              )

**FILED**

SEP 2 0 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

INSIDE PASSAGE ELECTRIC )
COOPERATIVE, )
)
CITY OF CRAIG, )
)
and )
)
SOUTHEAST ALASKA POWER AGENCY, )
)
Plaintiff-Intervenors, )
)
v. )
)
UNITED STATES DEPARTMENT OF )
AGRICULTURE, )
)
UNITED STATES DEPARTMENT OF )
AGRICULTURE FOREST SERVICE, )
)
GEORGE ERVIN "SONNY" PERDUE III[1], )
in his official capacity as Secretary of )
Agriculture, )
)
and )
)
TOM TIDWELL, in his official capacity as )
Chief of the United States Forest Service, )
)
Defendants, )
)
SOUTHEAST ALASKA CONSERVATION )
COUNCIL, )
)
ALASKA CENTER FOR THE )
ENVIRONMENT, )
)
BOAT COMPANY, )
)

---

[1] Plaintiff filed this case while Secretary Purdue's predecessor, Tom Vilsack, was serving as Secretary of Agriculture. When, during the course of these proceedings, Secretary Purdue succeeded to that office, he became automatically substituted as a defendant. *See* F. R. Civ. P. 25(d).

2

**TONGASS CONSERVATION SOCIETY,**        )
                                         )
**SIERRA CLUB,**                         )
                                         )
**WILDERNESS SOCIETY,**                  )
                                         )
**NATURAL RESOURCES DEFENSE**            )
**COUNCIL,**                             )
                                         )
**GREENPEACE, INC.,**                    )
                                         )
**DEFENDERS OF WILDLIFE,**               )
                                         )
              **and**                    )
                                         )
**CENTER FOR BIOLOGICAL DIVERSITY,**     )
                                         )
        **Defendant-Intervenors.**       )

## MEMORANDUM OPINION
September 26 2017 [Dkt. ## 94, 95, 96, 97]

In 2001, the United States Department of Agriculture ("USDA") promulgated the

Roadless Area Conservation Rule—commonly referred to as the "Roadless Rule"—

which limits road construction and timber harvesting in national forests. It is this Rule—

and its application to the Tongass National Forest (the "Tongass")—that the State of

Alaska ("Alaska" or "plaintiff") challenges today. In essence, Alaska argues that the

Roadless Rule was promulgated in an unrealistic time frame, without considering the

needs of individual states and without weighing the potentially devastating consequences

to multiple-use management on national forest lands. Specifically, Alaska alleges that

the Roadless Rule violates the National Environmental Policy Act of 1969, 42 U.S.C.

§§ 4321–70 ("NEPA"), the Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–06

("APA"), the Wilderness Act of 1964, 16 U.S.C. §§ 1131–36 ("Wilderness Act"), the

Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528-31 ("MUSYA"), the Organic

Administration Act, 16 U.S.C. § 475 ("Organic Act"), the National Forest Management

Act, 16 U.S.C. §§ 1600–14 ("NFMA"), the Tongass Timber Reform Act, Pub. L. No.

101–626, 104 Stat. 4426 (1990) (codified as amended in scattered sections of 16 U.S.C.)

("TTRA"), and the Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–

233 ("ANILCA"). Upon consideration of the record, the relevant law, and the briefs

submitted by the parties, I find that plaintiff has not shown that the USDA violated any

federal statute in promulgating the Roadless Rule. Defendants' and Defendant-

Intervenors' Cross-Motions for Summary Judgment are therefore GRANTED, and

Plaintiff's and Plaintiff-Intervenors' Motions for Summary Judgment are DENIED.

## BACKGROUND

### A. Statutory Framework

The National Forest System ("NFS") currently contains approximately 192 million

acres of land. AR Doc. 4609 (FEIS Vol. 1), at 3-111. This land includes 155 proclaimed

or designated national forests, 20 national grasslands, 51 purchase units, 8 land utilization

projects, 20 research and experimental areas, and 33 "other areas." 36 C.F.R.

§ 200.1(c)(2). Among the national forests within the Forest Service's jurisdiction is the

Tongass National Forest in Southeast Alaska. Covering roughly 16.8 million acres, the

Tongass is the nation's largest national forest. 68 Fed. Reg. 75,136, 75,137–39 (Dec. 30,

2003) (to be codified at 36 C.F.R. pt. 294). The Forest Service is responsible for

4

managing the NFS under, *inter alia*, the Organic Act, the MUSYA, and the NFMA,

which authorize the Forest Service to manage NFS lands and designate those lands for

multiple uses. In exercising its managerial authority under these statutes, the Forest

Service must also comply with the Wilderness Act and NEPA. I will briefly review the

relevant statutory text below.

In 1897, Congress enacted the Organic Act, which set forth a multiple-use

mandate for the management of the National Forests. The Act mandated that National

Forests may be established and administered only for the following purposes: (1) "to

improve and protect the forest within the boundaries"; (2) to "secur[e] favorable

conditions of water flows"; or (3) "to furnish a continuous supply of timber for the use

and necessities of citizens of the United States." 16 U.S.C. § 475. Over sixty years later,

after the Forest Service was transferred to the Department of Agriculture, Congress

codified the Organic Act's multiple-use mandate by enacting the MUSYA. 16 U.S.C.

§§ 528–31. The MUSYA directs the Forest Service to "administer the renewable surface

resources of the national forests for multiple use and sustained yield." *Id.* § 529.

Specifically, the MUSYA identifies "outdoor recreation, range, timber, watershed, and

wildlife and fish purposes" as the purposes for which the national forests are to be

established and administered. *Id.* § 528.

Four years after Congress enacted the MUSYA, it passed the Wilderness Act,

which "established a National Wilderness Preservation System to be composed of

federally owned areas designated by Congress as 'wilderness areas.'" 16 U.S.C.

§ 1131(a). Importantly, the Act explicitly retained Congress's authority to designate

5

which areas qualify as "wilderness areas." *Id.* § 1132. But to aid Congress in its task of

designating wilderness areas, the Act authorized the Secretary of Agriculture to "review,

as to its suitability or nonsuitability for preservation as wilderness, each area in the

national forests classified . . . as 'primitive.'" *Id.* § 1132(b). The Act also delegated to

the Forest Service the responsibility of "preserving the wilderness character of the area"

and "administer[ing] such area" for "the public purposes of recreational, scenic,

scientific, educational, conservation, and historical use." *Id.* § 1133.

In 1976, Congress passed the NFMA, which requires the Forest Service to

"develop, maintain, and, as appropriate, revise land and resource management plans for

units of the National Forest System." 16 U.S.C. § 1604(a). The Act imposes

requirements on NFMA's land and resource management plans, including the

requirement that any plan for the NFS must "provide for multiple use and sustained yield

of the products and services obtained therefrom in accordance with the [MUSYA]." *Id.*

§ 1604(e)(1).

Finally, any time the Forest Service exercises its authority under any of these

statutes, it is required to comply with NEPA, which mandates that federal agencies must

"carefully consider[] detailed information concerning significant environmental impacts"

of their proposed actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

349 (1989). Under NEPA, a federal agency must prepare an Environmental Impact

Statement ("EIS") whenever a proposed government action qualifies as a "major Federal

action[] significantly affecting the quality of the human environment." 42 U.S.C.

§ 4332(2)(C). And that EIS must "state how alternatives considered in it and decisions

6

based on it will or will not achieve the requirements of [NEPA] and other environmental laws and policies," 40 C.F.R. § 1502.2(d), discuss "[p]ossible conflicts between the proposed action and the objectives of Federal . . . land use plans, policies and controls for the area concerned," *id.* § 1502.16(c), and "present the environmental impacts of the proposal and the alternatives in comparative form," *id.* § 1502.14. Thus, any time the Forest Service takes action to manage NFS lands and designate those lands for multiple uses, it must do so in compliance with NEPA.

## B. History of the Rule

The origins of the Roadless Rule date back over four decades, when in 1972 the Forest Service embarked on a Roadless Area Review and Evaluation project ("RARE I") to identify roadless areas on NFS lands and determine their suitability for designation as wilderness, pursuant to its authority under the Wilderness Act. 16 U.S.C. § 1132(b); *see* 66 Fed. Reg. 35,918, 35,919 (July 10, 2001) (to be codified at 36 C.F.R. pts. 219, 294) (describing RARE I efforts). As part of this effort, the Forest Service inventoried approximately 56 million acres that it deemed suitable for designation as wilderness areas. *See Wyoming v. U.S. Dep't of Agric.*, 277 F. Supp. 2d 1197, 1205 (D. Wyo. 2003) (discussing RARE I inventory of NFS roadless areas), *vacated and remanded*, 414 F.3d 1207 (10th Cir. 2005). After the RARE I inventory was successfully challenged under NEPA, however, it was abandoned. *See Wyo. Outdoor Coordinating Council v. Butz*, 484 F.2d 1244 (10th Cir. 1973) (enjoining development pursuant to RARE I until the Forest Service completed an EIS), *overruled by Vill. of Los Ranchos de Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

7

Four years later, the Forest Service began a more extensive Roadless Area Review

and Evaluation project ("RARE II"), which also created an inventory of roadless areas

that the Forest Service deemed suitable for designation as wilderness. *Wyoming v. U.S.*

*Dep't of Agric.*, 277 F. Supp. 2d at 1205; *see also California v. Block*, 690 F.2d 753, 758

(9th Cir. 1982) (discussing the Forest Service's second attempt to evaluate the roadless

areas in the NFS). Relying on this inventory, Congress designated multiple NFS areas as

wilderness, totaling approximately 35 million acres. 66 Fed. Reg. at 35,919; AR Doc.

4609 (FEIS Vol. 1), at 1-5. Areas that were identified as roadless during the RARE II

inventory ("inventoried roadless areas" or "IRAs"), but were not subsequently designated

as wilderness by Congress, continued to be managed pursuant to each National Forest's

individual forest plan. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30

(1998). After another successful judicial challenge to the RARE II under NEPA,

however, the Forest Service halted its efforts to identify and manage roadless areas. *See*

*Block*, 690 F.2d at 763 (finding the RARE II EIS as submitted by the Forest Service

deficient under NEPA).

In the late 1990s, the Forest Service revisited its road-management policy, noting

that: (1) use of the National Forests had "shifted substantially toward recreation," (2)

there were insufficient funds to maintain existing roads, and (3) there was an

"accumulation of new scientific information" suggesting that "ecological impacts from

existing roads are more extensive than previously thought." 63 Fed. Reg. 4350, 4350

(Jan. 28, 1998) (to be codified at 36 C.F.R. pt. 212). The USDA subsequently published

a proposed interim rule that suspended road construction activities in IRAs, while it

developed "new and improved analytical tools . . . to evaluate the impact of locating and constructing roads." *Id.* at 4352. The Forest Service published the final Interim Roadless Rule on March 1, 1999, which established an 18-month moratorium on road construction in IRAs. 64 Fed. Reg. 7290, 7290 (Feb. 12, 1999) (to be codified at 36 C.F.R. pt. 212).

Later that year, President Clinton ordered the Forest Service to develop a plan to protect IRAs and determine whether non-inventoried roadless areas also needed protection. AR Doc. 4609 (FEIS Vol. 1), at 1-6. Within a week of the President's directive, the Forest Service published a Notice of Intent ("NOI") to prepare a draft EIS ("DEIS"). 64 Fed. Reg. 56,306 (Oct. 19, 1999). Not surprisingly, President Clinton demanded an uncharacteristically fast timeline for government work; he directed the Secretary of Agriculture to publish the final Rule *before* the President left office. AR Doc. 0193, at 23. The Forest Service acknowledged that this would require a very short timeframe for the public to respond to the NOI. AR Doc. 2315, at 7. *Id.* As a result, the NOI provided for a 60-day scoping and public comment period. 64 Fed. Reg. at 56,307.

During the 60-day scoping period, the Forest Service received more than 517,000 comments in response to the NOI, held 187 meetings around the nation (which were attended by approximately 16,000 people), and launched a Roadless Area Conservation website (www.roadless.fs.fed.us) to provide information about the rulemaking. 66 Fed. Reg. 3243, 3248 (Jan. 12, 2001) (to be codified at 36 C.F.R. pt. 294); AR. Doc. 4609 (FEIS Vol. 1, 4-1), at 497. Despite multiple requests to extend the scoping period beyond the 60 days provided for by the NOI, the Forest Service declined to do so. AR Doc. 4485, at 1; AR Doc. 4111 (FEIS Vol. 4), at 80–81, 161, 500, 589.

9

After assessing the information gathered during the scoping period, the USDA released a proposed rule and DEIS on May 10, 2000. AR Doc. 1362 (DEIS Vol. 1); 65 Fed. Reg. 30,276 (proposed May 10, 2000) (to be codified at 36 C.F.R. pt. 294). The DEIS declared that the purpose of the proposed action was: (1) "to immediately stop activities that have the greatest likelihood of degrading desirable characteristics of inventoried roadless areas"; (2) "to ensure that ecological and social characteristics of inventoried roadless and other unroaded areas are identified and considered through local forest planning efforts"; and (3) "to consider the unique social and economic situation of the Tongass National Forest." AR Doc. 1362 (DEIS Vol. 1), at S-4; 65 Fed. Reg. at 30,277. Based on these three purposes, the proposed rule had three main parts: (1) a Prohibition Rule, which banned road construction and reconstruction in IRAs; (2) a Procedural Rule, which required forest managers to identify additional roadless areas and assess whether they should be protected under individual forest plans; and (3) the Tongass option, which required the Agency to consider the rule's applicability, if any, to the Tongass National Forest. AR Doc. 1362 (DEIS Vol. 1), at S-7 to S-12.

The DEIS identified 54.3 million acres of IRAs that were subject to the proposed rule. 65 Fed. Reg. at 30,276. The Forest Service then considered several alternatives for each of the three parts of the rule. AR Doc. 1362 (DEIS Vol. 1), at S-6 to S-13, 2-2 to 2-13. As to the Prohibition Rule, the USDA considered: (1) taking no action; (2) prohibiting only road construction and reconstruction within unroaded portions of IRAs; (3) prohibiting road building and commodity-purpose timber harvests, but allowing timber cutting for "stewardship purposes" on unroaded portions of IRAs; and (4)

10

prohibiting road construction, reconstruction, and all timber harvest within unroaded portions of IRAs. *Id.* at S-7 to S-8. For the Procedural Rule, the USDA considered: (1) adding no new procedures; (2) requiring forest managers to consider whether additional conservation measures were warranted for IRAs; (3) requiring that IRAs be considered on a project-by-project basis; and (4) requiring project-by-project consideration until IRAs could be assessed during revisions to forest management plans. *Id.* at S-9 to S-11. Finally, as to the rule's applicability to the Tongass National Forest, the USDA considered: (1) applying the rule to the Tongass; (2) deferring the decision on the rule's applicability to the Tongass until the 5-year review of the Tongass land management plan; and (3) applying the Rule in IRAs falling within specific land use designations defined by the Tongass Forest Plan. *Id.* at S-11 to S-13. In the DEIS, the USDA designated the preferred alternatives as (1) prohibiting only road building on IRAs; (2) deferring consideration of whether additional conservation measures were warranted until forest plan revisions; and (3) deferring the decision as to the rule's applicability to the Tongass until a review of the Tongass's land management plan. *Id.* at 2-13.

In November 2000, as scheduled, the Forest Service issued the final EIS ("FEIS"). AR Doc. 4609 (FEIS Vol. 1). The FEIS contained four material departures from the DEIS. First, the USDA had revised its IRA maps, which increased the total acreage of IRAs subject to the Prohibition Rule from 54.3 million acres to 58.5 million acres. AR Doc. 4609 (FEIS Vol. 1), at 2-23. The revised figure included 4.2 million acres of IRAs not identified in the DEIS or proposed rule. *Id.* Second, it eliminated the distinction

11

between "roaded" and "unroaded" portions of IRAs so that the Rule would apply to all portions of IRAs, not just the unroaded portions. *Id.* Third, the FEIS changed the preferred alternative with respect to the Prohibition Rule. *Id.* at 2-13 to 2-14. The DEIS chose the alternative that prohibited road construction and reconstruction in IRAs, but the FEIS selected the alternative that prohibited road construction, reconstruction, and timber harvest, except for stewardship purposes, in IRAs. *Id.* And fourth, the FEIS eliminated the Procedural Rule portion of the Roadless Rule on the ground that the procedural aspects of the Rule would be addressed in a separate rulemaking. *Id.* at ES-2. Like the DEIS, the FEIS considered several alternatives for the Prohibition Rule. *Id.* at 3-21 to 3-403. As to the Tongass, while the DEIS considered three alternatives, the FEIS considered four: (1) Tongass Not Exempt—which would apply the Rule to the Tongass; (2) Tongass Exempt—which would exempt the Tongass from the Rule; (3) Tongass Deferred—which would defer the decision as to the Rule's applicability to the Tongass until the 5-year review of the Tongass land management plan; and (4) Tongass Selected Areas—which would apply the Rule only to selected areas of the Tongass identified in the Tongass's land management plan. *Id.* at 2-10 to 2-12.

On January 12, 2001, in the final hours of the Clinton Administration, the Forest Service published the final Roadless Rule and the Record of Decision ("ROD") on the rule. 66 Fed. Reg. 3243 (Jan. 12, 2001) (to be codified at 36 C.F.R. pt. 294). The final Rule—applicable to the 58.5 million acres of IRAs identified in the FEIS—prohibits road construction in IRAs, as contemplated by the preferred alternative from the FEIS. *Id.* at 3272–73. This prohibition is subject to several exceptions, including when a road is

12

needed "in conjunction with the continuation, extension, or renewal of a mineral lease." *Id.* The Rule also prohibits timber harvesting in inventoried roadless areas, subject to limited exceptions. *Id.* at 3273. With respect to the Tongass, the USDA determined that the Tongass should not be exempt from the Rule. *Id.* at 3254. To ease the transition for forest-dependent communities, the USDA exempted any timber projects and related road construction in IRAs that were planned on or before the date the Rule was issued. *Id.*

### C. Litigation History

As one might expect for a far-reaching environmental regulation such as this, the Roadless Rule faced several judicial challenges immediately after it was promulgated. Indeed, despite the USDA's hopes that the Rule would reduce litigation about forest management, *id.* at 3244, 3246, within a year of its adoption, a federal judge in Idaho granted a preliminary injunction enjoining the Rule on the ground that it violated NEPA. *Kootenai Tribe of Idaho v. Veneman*, No. CV01-10-N-EJL, 2001 WL 1141275, at \*2 (D. Idaho May 10, 2001). The Ninth Circuit reversed, holding that plaintiffs had not shown a likelihood of success on the merits of their NEPA claim. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1126 (9th Cir. 2002), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1178–80 (9th Cir. 2011) (en banc). After the Ninth Circuit issued the mandate in *Kootenai* in April of 2003, the Roadless Rule took effect. *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1007 (9th Cir. 2009) (summarizing the history of the Roadless Rule). But in 2008, a Wyoming district court again permanently enjoined the Roadless Rule, finding that it violated NEPA, the Wilderness Act, and the APA. *Wyoming v. U.S. Dep't of Agric.*, 570

13

F. Supp. 2d 1309, 1355 (D. Wyo. 2008). In 2011, the Tenth Circuit once again reversed that judgment. *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1272 (10th Cir. 2011).

The State of Alaska has also challenged the Roadless Rule once before. In a complaint filed in the District of Alaska just 19 days after the Rule was published, Alaska alleged that the Roadless Rule violated, *inter alia*, NEPA, the APA, the ANILCA, and the TTRA. Complaint, *Alaska v. U.S. Dep't of Agric.*, No. 3:01-cv-00039-JKS (D. Alaska Jan. 31, 2001), ECF No. 1. That case settled, and Alaska's complaint was dismissed. In exchange for Alaska's voluntary dismissal of its case, however, the USDA agreed to publish a proposed rule that would *temporarily* exempt the Tongass from the application of the Roadless Rule, as well as an advanced notice of proposed rulemaking to permanently exempt the Tongass from the Rule. 68 Fed. Reg. 41,865, 41,866 (Jul 15, 2003) (to be codified at 36 C.F.R. pt. 294); *see Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 962 (9th Cir. 2015) (en banc) (describing the history of the Alaska litigation). Five months later, the USDA issued a ROD promulgating the final Tongass exemption. 68 Fed. Reg. 75,136 (Dec. 30, 2003) (to be codified at 36 C.F.R. pt. 294). Importantly, the ROD found that "the overall decisionmaking picture [was] not substantially different" from the ROD that was promulgated in 2001 and that the public comments about the Tongass exemption "raised no new issues . . . not already fully explored" in the initial rulemaking. *Id.* at 75,141, 75,139. The USDA accordingly relied on the 2001 FEIS rather than preparing a new one. *Id.* at 75,136, 75,141. Contrary to the 2001 ROD, the 2003 ROD concluded that application of the Roadless Rule to the Tongass was *unnecessary* to maintain the area's roadless values. *Id.* at 75,137.

14

judgment, but before this Court issued its opinion, the Ninth Circuit decided *Organized Village of Kake*, 795 F.3d at 956. Accordingly, I issued an order shortly thereafter requiring the parties to submit supplemental briefing on the potential res judicata effects of that decision. *See* ECF No. 91. The motions for summary judgment, and the supplemental briefing, are now ripe for review.

## STANDARD OF REVIEW

Because NEPA, the NFMA, the MUSYA, the TTRA, ANILCA, the OAA, and the Wilderness Act do not create a private right of action for violations of those statutes, I review the Forest Service's promulgation of the Roadless Rule as a final agency action under the APA. 5 U.S.C. §§ 551–59. Under Federal Rule of Civil Procedure 56(a), summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Because this case challenges a final agency action under the APA, my review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). The Supreme Court has instructed that agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In conducting my review, I am mindful of the fact that "the role of the agency [is] to resolve factual issues," whereas the sole "function of the district court is to determine

16

The Tongass Exemption was challenged in the District of Alaska in 2009 on the grounds that it violated NEPA and the APA. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 776 F. Supp. 2d 960, 967 (D. Ala. 2011). Alaska intervened as a party-defendant in that case. *Id.* at 961. The district court agreed with plaintiff, finding that the Tongass Exemption violated the APA because "the Forest Service provided no reasoned explanation as to why the Tongass Forest Plan protections it found deficient in [2001], were deemed sufficient in [2003]." *Id.* at 974. The court accordingly vacated the Tongass exemption. *Id.* at 977. Alaska appealed that decision, and the Ninth Circuit reversed. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 973 (9th Cir. 2014). But on rehearing en banc, the Ninth Circuit reversed, holding that the Department did not provide a reasoned explanation as to why it made such a vast change in policy while relying on the identical factual record it compiled in 2001, when it explicitly chose not to exempt the Tongass from the Rule. *Organized Vill. of Kake*, 795 F.3d at 959.

**D. Procedural History of this Case**

Alaska filed the present action in this Court in 2011, in which it challenges the Roadless Rule under several federal statutes, including the APA and NEPA. Compl. ¶ 1, ECF No. 1. Various interest groups intervened as both plaintiff-intervenors and defendant-intervenors, and this Court granted their motions. *See* ECF Nos. 11, 17, 25, 27. On March 25, 2013, this Court held that plaintiff's claim was barred by the statute of limitations and accordingly granted defendants' motion to dismiss. *See* ECF Nos. 58, 59. Plaintiff appealed, however, and our Circuit reversed and remanded, holding that plaintiff had timely filed its complaint. *See* ECF No. 66. Both parties moved for summary

15

whether or not as a matter of law the evidence in the administrative record permitted the

agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90

(D.D.C. 2006) (quoting *Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753

F.2d 766, 769 (9th Cir. 1985)). Accordingly, I must determine "whether the agency acted

within the scope of its legal authority, . . . explained its decision, . . . relied [on facts that]

have some basis in the record, and . . . considered the relevant factors." *Fund for Animals*

*v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995). Thus, unless I find that the agency has

acted arbitrarily and capriciously, I cannot disturb the agency's decision.

## DISCUSSION

### A. Standing

I begin this case—as I do all cases—by assessing whether I have jurisdiction to

review the merits of plaintiff's and plaintiff-intervenors' claims. In their cross motion for

summary judgment, the federal defendants argue that plaintiff and plaintiff-intervenors

have failed to satisfy their burden on standing because "neither parties' opening brief

contains even the briefest averment as to standing." Defs.' Mem. Supp. Summ. J. & in

Opp'n to Pl.'s & Pl.-Intervenors' Mots. Summ. J. 12, ECF No. 76-1 ("Defs.' Mem."). In

particular, they cite *Sierra Club v. EPA*, in which our Circuit stated that a plaintiff must

set forth "its arguments and any affidavits or other evidence" in its motion for summary

judgment, "and not . . . in reply to the brief of the respondent agency." 292 F.3d 895, 900

(D.C. Cir. 2002). According to the federal defendants, plaintiff's and plaintiff-

intervenors' failure to do so warrants dismissal of their complaints for lack of

jurisdiction. Unfortunately for defendants, our Circuit's rule is not as rigid as they make it out to be. How so?

In *American Library Association v. FCC*, the Court clarified that plaintiffs "should explain the basis for their standing at the earliest appropriate stage in the litigation" when they "*have good reason to know that their standing is not self-evident*." 401 F.3d 489, 493 (D.C. Cir. 2005). The Court further explained that "[n]othing in *Sierra Club* suggests that it is intended to create a 'gotcha' trap whereby parties who reasonably think their standing is self-evident nonetheless may have their cases summarily dismissed if they fail to document fully their standing at the earliest possible stage in the litigation." *Id.* In this case, when plaintiff-intervenors filed their respective motions to intervene, they included affidavits and statements of facts in which they discussed their interest in the litigation and their bases for Article III standing. *See, e.g.*, ECF Nos. 11 to 11-5, 17 to 17-21, 21, 25-1 to 25-2. Defendants did not oppose these motions for intervention, and after satisfying myself of plaintiff-intervenors' Article III standing, I granted the motions. *See* ECF No. 35; *see also Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003) ("[A] party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution."). As such, plaintiff-intervenors had reasonable cause to believe that their standing was self-evident. *American Library*, 401 F.3d at 493.

Alaska, too, had reason to believe that it did not need to submit additional evidentiary support for its Article III standing. The injuries Alaska will suffer as a result of the Roadless Rule are extensively documented in the administrative record for the

18

rulemaking, which is a part of the record in this case. *See, e.g.*, AR Doc. 4609 (FEIS Vol.

1), at 3-380 (estimating that the application of the Roadless Rule to the Tongass would

result in between 864 and 895 lost jobs and between $37.3 million and $38.7 million in

lost personal income). Indeed, the very fact that the USDA treated the Tongass Forest

differently from any other national forest—and considered four different alternatives for

the Tongass in its FEIS—shows that it recognized that the Roadless Rule would have a

significant impact on the Tongass. The USDA even acknowledged that job loss and

damage to the state and local timber economies were the two main reasons that it chose to

consider alternatives specific to the Tongass in its rulemaking. *See* AR Doc. 5796, at 13.

And when the USDA promulgated the Tongass exemption in 2003, it did so because "the

roadless rule was predicted to cause substantial social and economic hardship in

communities throughout Southeast Alaska." 68 Fed. Reg. at 75,136. Thus, I will decline

defendants' urging that I summarily dismiss plaintiff's and plaintiff-intervenors' claims

for failing to argue standing in their opening briefs.

Having decided that plaintiff and plaintiff-intervenors did not waive their right to

argue standing, I now turn to the question whether plaintiff and plaintiff-intervenors have,

in fact, established standing.[2] To satisfy Article III's standing requirement, plaintiff and

---

[2] After the en banc Ninth Circuit vacated the 2003 Tongass exemption to the Roadless Rule, *see Organized Vill. of Kake*, 795 F.3d at 963, I ordered the parties to submit supplemental briefing as to whether this Court was bound by the Ninth Circuit's determination of standing in that case. *See* ECF No. 91. Although the Ninth Circuit held that Alaska had standing to appeal the decision in *Organized Village of Kake*, the parties—and this Court—agree that the Ninth Circuit's holding does not bind this Court to reach the same conclusion. This is because the doctrine of issue preclusion bars successive litigation of an issue of fact or law only where: (1) "the same issue now being raised [was] contested by the parties and submitted for judicial determination in the prior case"; (2) "the issue [was] actually and necessarily determined by a court of competent jurisdiction in that prior case"; and (3) "preclusion in the second case

plaintiff intervenors were required to show that (1) they have suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to defendants' challenged action; and (3) it is likely, rather than merely speculative, that a favorable decision in this case will redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Here, Alaska easily satisfies this standard. First, the administrative record confirms that the total direct and indirect job and income losses from the Roadless Rule would be around 864 to 895 jobs and a corresponding 37.3 to 38.7 million dollars in income. AR Doc. 4609 (FEIS Vol. 1), at 3-380. Second, it is clear that the injury can be traced to defendants' promulgation of the Roadless Rule because the decline in logging activity—and the resultant job loss— would not occur but for the USDA's implementation of the Rule. And third, a favorable decision (*i.e.*, a vacatur of the Roadless Rule) would redress Alaska's injury.

As to the plaintiff-intervenors, all of them filed motions to intervene, along with exhibits outlining the injuries they would suffer under the Roadless Rule. *See generally* ECF Nos. 11 to 11-5, 17 to 17-21, 21, 25-1 to 25-2. And all of them adequately identified their respective interests in this case. For example, Southeast Alaska Power

---

[would] not work a basic unfairness to the party bound by the first determination." *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (quoting *Yamaha Corp. of Amer. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). Here, the issue of Alaska's standing was not actually litigated by the parties in *Organized Village of Kake*, 795 F.3d at 956. In that case, Alaska and the United States were not adversaries. Rather, Alaska was defending the Tongass exemption, and Alaska intervened as defendant-intervenor. *See* Fed. Defs.' & Def.-Intervenors' Suppl. Br. Addressing the Court's Sept. 2, 2016 Order, ECF No. 98 ("Defs.' Suppl. Br."), Ex. 7 (Alaska's Mot. Intervene, *Organized Vill. of Kake v. U.S. Dep't of Agric.*, No. 1:09-cv-00023 (D. Alaska Jan. 28, 2010), ECF No. 23). Further, neither Alaska nor the USDA had the opportunity to litigate the question of Alaska's standing in that case; instead, the en banc Ninth Circuit reached the issue *sua sponte* on appeal. I accordingly address the issue of plaintiff's and plaintiff-intervenors' standing *de novo*.

Agency—an owner of two hydroelectric projects and associated transmission facilities—explained that, without road access, its maintenance work would need to be done by a helicopter, which is prohibitively expensive. *See* Mot. Intervene 3 & Ex. 2, ¶ 11, ECF Nos. 25, 25-2. Similarly, the Alaska Forest Association alleged economic injury due to the likely lost timber sales that its members would experience as a result of the Rule. *See* Mot. Intervene 7 & Ex. 2, ¶ 9, ECF Nos. 11, 11-2. And the Southeast Conference demonstrated that its members would face loss of income due to their inability to harvest timber, mine, and operate hydroelectric projects in federal acreage. *See* Mot. Intervene 8 & Ex. 3, ¶ 12, ECF Nos. 11, 11-2. As this Court already determined when deciding to grant plaintiff-intervenors' motions to intervene, *see, e.g.*, Aug. 15, 2011 Minute Order, plaintiff-intervenors have adequately established injuries-in-fact sufficient to satisfy Article III. And, much like Alaska, plaintiff-intervenors satisfy the causation and redressability requirements of constitutional standing because, but for the Roadless Rule, they would not suffer the economic injury of which they complain. I therefore conclude that both Alaska and plaintiff-intervenors have satisfied their burden on Article III standing, and thus this Court has jurisdiction to assess the merits of their claims.[3]

---

[3] The Supreme Court has previously held that the protection of the environment falls within NEPA's zone of interests. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983); *see also Mountain States Legal Found. v. Madigan*, No. 92–0097, 1992 WL 613292, at *1 (D.C. Cir. May 7, 1992) ("As to what is the zone of interests sought to be protected by NEPA, the Supreme Court has made clear that NEPA was designed to protect 'the physical environment—the world around us so to speak.'" (quoting *Metro. Edison*, 460 U.S. at 772)); *City of Davis v. Coleman*, 521 F.2d 661, 672 (9th Cir. 1975) ("[T]he environmental interests [NEPA] seeks to protect are shared by all citizens."). Here, plaintiff and plaintiff-intervenors assert that the Tongass will be threatened by implementation of the Roadless Rule. These interests fall within NEPA's goal of preventing harm to the environment, and thus, plaintiff's and plaintiff-intervenors' alleged injuries fall within the zone of interests that NEPA aims to protect. As such, plaintiff and plaintiff-intervenors have satisfied the requirements of prudential standing as well.

## B. Res Judicata

Before turning to the substance of plaintiff's and plaintiff-intervenors' claims,

there is one more procedural hurdle this Court must scale: whether the doctrine of claim

preclusion bars Alaska from raising its claims in this Court. After the en banc Ninth

Circuit vacated the 2003 Tongass exemption to the Roadless Rule, *see Organized Village

of Kake*, 795 F.3d at 963, I ordered the parties to submit supplemental briefing as to

whether the doctrine of claim preclusion barred Alaska from claiming that the Roadless

Rule is invalid as applied to the Tongass. *See* ECF No. 91. Under the doctrine of claim

preclusion, "a final judgment forecloses 'successive litigation of the very same claim,

whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Taylor

v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742,

748 (2001)). Our Circuit has held that "a subsequent lawsuit will be barred if there has

been prior litigation (1) involving the same claims or cause of action, (2) between the

same parties or their privies, and (3) there has been a final, valid judgment on the merits,

(4) by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192

(D.C. Cir. 2006). Importantly, the doctrine of claim preclusion "precludes the parties or

their privies from relitigating issues that were or *could have been raised*" in the first

action. *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002) (quoting *Allen v. McCurry*, 449

U.S. 90, 94 (1980)). Because Alaska and the USDA were both parties in *Organized

Village of Kake*, and that case resulted in a final, valid judgment by a federal court, three

of the four elements of claim preclusion are satisfied here. This Court is therefore tasked

with deciding whether the remaining element of claim preclusion is also met. That is, I

22

must decide whether this case involves the same claims or causes of action such that Alaska could have raised its challenge to the Roadless Rule in *Organized Village of Kake*. I hold that it does not.

Upon review of the Ninth Circuit's decision in *Organized Village of Kake*, it is clear that the Court did not address whether the Roadless Rule is valid as applied to the Tongass. Instead, the Court's review was limited to deciding whether the Tongass Exemption—a regulation promulgated two years after the Roadless Rule—was valid. In ruling that the Tongass exemption violated the APA, the Court did not hold that the Roadless Rule *should* be applied to the Tongass; rather, the Court held that the USDA's record of decision ("ROD") did not provide a reasoned explanation for its change of course. *Organized Village of Kake*, 795 F.3d at 959. Indeed, the Court questioned why, just two years after finding that the Roadless Rule should apply to the Tongass—and relying on an identical factual record to the one that formed the basis of the Roadless Rule—the USDA reversed course and found that it was unnecessary to apply the Rule to the Tongass. *Id.* Critically, nowhere in the Ninth Circuit's opinion does it address whether the Roadless Rule—in its original form—is valid under the APA. It is therefore clear that the issue of the Roadless Rule's application to the Tongass was not raised in *Organized Village of Kake*. The only remaining question is whether Alaska could have— and did not—raise its challenges to the Rule in that case.

Relevant to this question is the fact that the USDA and Alaska were litigating in favor of the same position in *Organized Village of Kake*. In that case, the USDA was defending the Tongass exemption to the Roadless Rule, and Alaska intervened as a

23

defendant. *See* Defs.' Suppl. Br., Ex. 7. Thus, Alaska's and the USDA's interests were aligned. To raise its challenges to the Roadless Rule, Alaska would have had to bring a crossclaim against the USDA. But neither the parties nor this Court have found authority to support the notion that a defendant who failed to file a crossclaim against a co-defendant is barred by claim preclusion from later raising that claim in a new case. Indeed, crossclaims are permissive by definition. *See* 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1431 (3d ed. 2016) ("A party who decides not to bring a claim under Rule 13(g) will not be barred by res judicata, waiver, or estoppel from asserting it in a later action, as the party would if the claim were a compulsory counterclaim under Rule 13(a)."). Indeed, it would be quite the rigid rule to require Alaska to challenge an older version of the Roadless Rule in a litigation focused solely on the new version of the rule. And it would be an even harsher remedy to hold that Alaska forfeited all of its claims by failing to do so. Fortunately for plaintiff, this Court has no reason to conclude that the doctrine of claim preclusion is so unforgiving as that. I accordingly hold that Alaska's claims are not barred by claim preclusion, and I turn to the merits of this dispute.

## C. Alaska's General Challenges to the Roadless Rule Nationwide

### 1. Alaska's Challenge under NEPA

Alaska raises several challenges to the Roadless Rule under NEPA, each of which I address below. Under NEPA, federal agencies must "consider fully the environmental effects of their proposed actions." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010). Importantly, NEPA "does not mandate particular

results," but instead prescribes procedures that agencies must follow to ensure that they "take a 'hard look' at the environmental consequences of proposed federal action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 352 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 68 (D.C. Cir. 2011) ("Put simply, NEPA ensures 'a fully informed and well-considered decision, not necessarily the best decision.'" (quoting *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503)). Mindful of these requirements that NEPA imposes, I find that the USDA complied, indeed, with its obligations under the statute.

### a. The Purpose and Need Statement

In light of the fact that the Forest Service reported that 2.8 million acres of IRAs had been roaded in the 20 years prior to the rulemaking, the stated purpose of the Roadless Rule was to avoid further loss of roadless areas. AR Doc. 4609 (FEIS Vol. 1), at 1-14 ("The purpose of this action is to conserve and protect the increasingly important values and benefits of roadless areas. . . ."). Alaska insists, however, that the stated objective for the Roadless Rule was arbitrary and capricious "because it was founded on a fundamental assumption that ran contrary to evidence then known to USDA, *i.e.*, that inventoried roadless areas were being increasingly lost to roadbuilding." Pl.'s P. & A. Supp. Summ. J. 10, ECF No. 72 ("Pl.'s Mem."). According to Alaska, the Forest Service failed to disclose in the DEIS—and did not adequately disclose in the FEIS—that "even without the Roadless Rule, [Forest Service] wilderness experts conservatively estimated that the amount of unroaded national forest land would *increase* by at least 8.4 million

acres over the next 40 years due to road decommissioning." *Id.*; AR Doc. 6004, at 690.

Upon review of the administrative record, I disagree.

Our Circuit has made clear that it is the prerogative of the agency to define the purpose of a rulemaking, and I must uphold an agency action "so long as the objectives that the agency chooses are reasonable." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991); *see also Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72–73 (an agency's definition of purpose and need is reviewed under the "rule of reason"). Here, the USDA asserts that Alaska misunderstands the important ecological differences between IRAs and new unroaded areas that are created through road decommissioning. Defs.' Mem. 14. The record shows that IRAs protect the watersheds that provide drinking water to millions of Americans, and they contain and protect more than 220 species that are listed as threatened, endangered, or proposed for listing under the Endangered Species Act. 66 Fed. Reg. at 3245, 3247; AR Doc. 4609 (FEIS Vol. 1), at 1-1. But because IRAs were usually managed at the local forest level—rather than on a national level—most forest plans allowed for road building before the promulgation of the Roadless Rule. 66 Fed. Reg. at 3246. In the absence of additional protections, the USDA projected that an additional 5 to 10 percent of IRAs would be roaded by 2020, and 18 to 28 percent of existing IRAs would be roaded by 2040. AR Doc. 4609 (FEIS Vol. 1), at 3-34. Despite Alaska's assertion that all areas without roads are of equal value, the USDA explicitly rejected this idea in the FEIS because decommissioned roads continue to have adverse environmental impacts. *Id.* at 2-18. This Court is therefore satisfied that

the USDA's purpose and need statement for the Roadless Rule does not violate the rule of reason.

### b. The Cumulative Effects of the Roadless Rule

Alaska's next attack on the Roadless Rule is that the USDA unlawfully failed to disclose the cumulative effects of other roads policies. Under NEPA, an agency's EIS is required to examine a proposed project's direct, indirect, and cumulative impacts. 40 C.F.R. §§ 1508.7, 1508.8; *see also* 42 U.S.C. § 4332; 40 C.F.R. §§ 1502.16, 1508.25. As part of this process, the agency "must also assess the impact the proposed project will have in conjunction with other projects in the same and surrounding areas . . . and must include past, present, and reasonably foreseeable future actions." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503. Here, Alaska claims that the USDA intentionally withheld and misrepresented the fact that other rulemakings related to NFS roads would create more than 8 million acres of new unroaded national forest in the foreseeable future. Pl.'s Mem. 13–14. Unfortunately for plaintiff, I cannot agree with its reading of the administrative record.

Despite plaintiff's claims of intentional withholding of the Forest Service's Roads Policy, the FEIS contains an extensive review of the cumulative effects of the Roadless Rule, including a discussion of the Roads Policy. AR Doc. 4609 (FEIS Vol. 1), at 1-8 to 1-20, 3-34 to 3-39, 3-240 to 3-241, 3-397 to 3-398. For example, the FEIS makes clear that the decommissioning of roads under the Roads Policy—along with the ongoing trend of building fewer roads—would likely result in a reduction of the existing road system from 386,000 miles to between 260,000 and 300,000 miles by 2040. *Id.* at 3-34 to 3-36.

Although the FEIS notes that there is uncertainty regarding precisely how many unroaded areas will be created as a result of the road decommissioning, it discloses that the USDA "estimates that the unroaded area acres are likely to increase 5% to 10% by the time NFS roads stabilize at 260,000 miles to 300,000 miles nationally." *Id.* at 3-38. Alaska insists that this disclosure is not enough, and that the Agency failed to disclose the crucial estimate that 8.4 million acres of new unroaded areas would be created in the near future. Pl.'s Mem. 17. But it is clear from the record that the FEIS identified the 8.4 million acre estimate at least three times. *See, e.g.,* AR Doc. 4609 (FEIS Vol. 1), at 3-221, 3-230, 3-241. As such, this Court finds no evidence that the USDA intentionally misled the public as plaintiff suggests. Pl.'s Mem. 15, 18.

### c. Informed Comment and Decisionmaking

Plaintiff also challenges the rulemaking on the ground that the USDA failed to gather informed comment and thus failed to make an informed decision in violation of NEPA. Alaska seems to want this Court to presume that, because the USDA conducted such a far-reaching rulemaking in an extraordinarily short time period, the USDA *necessarily* did not satisfy NEPA's goals of adequate public disclosure and informed decision-making. *Id.* at 20. Indeed, the fact that the USDA issued a rule affecting a whopping 2 percent of all land in the United States in less than 15 months is alarming, especially in light of the crawling pace at which administrative agencies typically conduct their business. AR Doc. 1535, at 2; *compare id.* (October 13, 1999 presidential directive to commence rulemaking), *with* 66 Fed. Reg. 3243 (Jan. 12, 2001) (promulgation of Roadless Rule less than 15 months later). But upon review of the record herein, I find

that the USDA complied with NEPA in conducting its public comment and decisionmaking processes.

First, Alaska insists that the USDA's rushed effort to gather information made it impossible for individual forests to contribute to the decisionmaking process. Pl.'s Mem. 21–23. As evidence of this, Alaska cites a memorandum to regional foresters that required them to provide "information on the inventoried roadless areas in their forests" in just two days, information on the existing roads in the forest and "the estimated number of roads" to be constructed or closed for timber projects in four days, and other information in fifteen days. *Id.* at 21. Alaska also cites an email that, in its view, "epitomizes the rushed nature of the entire rulemaking." *Id.* at 22. This email required information "on an aspect of impacts" by close of business, and acknowledged that "many of you may not read this prior to COB today." *Id.* Based on this evidence, Alaska concludes that the USDA's rushed approach led to "significant internal issues . . . regarding the accuracy of the data." *Id.* Unfortunately for plaintiff, however, the pace of the information-gathering process does not necessarily bear upon the adequacy or reliability of the information gathered.

Although the USDA sought extensive contributions from Forest Service field offices on a relatively abbreviated timeline, the information the USDA sought was generally already in the possession of those field offices. For example, the USDA requested existing acreage data, but IRAs had been mapped for more than 30 years and were included in individual forest plans. *See* AR Doc. 2315, at 7. This Court cannot conclude that such requests were unreasonable in light of the fact that the information

29

was readily accessible to the field offices. And Alaska has not proffered any other evidence that shows a meaningful inaccuracy in the evidence the USDA relied upon during the rulemaking process.

Second, Alaska argues that the USDA erred in denying Alaska's request to participate in the rulemaking as a "cooperating agency" pursuant to NEPA. Pl.'s Mem. 24–25. The law is clear, however, that the decision whether to grant cooperating agency status is committed to the discretion of the agency and is not judicially reviewable under the APA. *See* 40 C.F.R. §§ 1501.6, 1508.5. This Court's role in reviewing Alaska's argument on this point therefore ends here.

Third, Alaska complains that the USDA erred in declining to extend the periods for public comment during scoping and on the DEIS. Pl.'s Mem. 25. While it is not surprising—given the scope of the proposed rule and the condensed timeframe for the rulemaking—that many state and local governments sought extensions on the comment period, the USDA was not required to grant those requests. NEPA's implementing regulations establish a minimum requirement of only 45 days for public comment. 40 C.F.R. § 1506.10(c). The 69-day period the USDA provided here is more than 50 percent beyond the minimum requirement. And it is clear from the record that the Forest Service garnered significant public input during that time. During that 69-day period, the Forest Service held over 400 public meetings (including over 30 in Alaska), which were attended by over 23,000 people. AR Doc. 4609 (FEIS Vol. 1), at 1-7; AR Doc. 3604. The Forest Service also received over 1.1 million written comments on the DEIS during this time. AR Doc. 4609 (FEIS Vol. 1), at 1-7. Despite Alaska's concerns regarding the

30

breadth of the rule, it is not the role of this Court to decide whether more time would have been beneficial. I must decide only whether the comment period was insufficient under the law, and I hold that it was not.

Finally, Alaska avers that the USDA's failure to disclose adequate maps identifying IRAs to the public undermined the validity of the rulemaking process. Pl.'s Mem. 27. According to Alaska, "[w]ithout such critical information that goes right to the heart of the need (or lack therefore [sic]) for the Roadless Rule, the comments received from the public were not informed comments and the USDA decision was not an informed decision process." *Id.* Based on the record before me, however, I cannot agree. Contrary to Alaska's assertions, the Forest Service made available state-wide maps of all IRAs *four months prior* to the release of the DEIS. AR Doc. 76. And with both the DEIS and the FEIS, the Forest Service produced both a state-level map for each state and a more detailed forest-level map for each forest within the state. *See, e.g.*, AR Doc. 1364 (DEIS Vol. 2), at 1, 5–10; AR Doc. 4110 (FEIS Vol. 2), at 1, 5–10. Both of these maps showed IRAs in detail. *Id.* And while Alaska identifies a handful of comments criticizing the mapping, *see* Pl.'s Mem. 22, 29, these isolated issues fall far short of demonstrating that the alleged deficiencies in the maps violated NEPA.

### d. The Supplemental EIS

Alaska's final challenge to the Rule under NEPA is that the differences between the DEIS and FEIS were so significant as to require the USDA to prepare a supplemental EIS for additional public comment. *Id.* at 30. Indeed, supplemental NEPA analysis is required if there are "*significant* new circumstances or information relevant to

31

environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (emphasis added). But our Circuit has emphasized that a "supplemental EIS is only required where new information 'provides a *seriously* different picture of the environmental landscape.'" *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 218 (7th Cir. 1984)). And an agency is "generally entitled to deference when it determines that new information or a change made to the proposed action does not warrant preparation of a supplemental EIS." *Wyoming*, 661 F.3d at 1258 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 375–77 (1989)). Alaska sets forth two main changes between the DEIS and the FEIS that allegedly required a supplemental EIS: (1) the FEIS identified approximately 7 million additional acres of IRAs that would be subject to the Rule; (2) the USDA changed its proposed alternative from exempting the Tongass to not exempting the Tongass. Pl.'s Mem. 30. As such, I must decide whether these changes between the DEIS and the FEIS were so substantial as to require a supplemental EIS. Unfortunately for plaintiff, I hold that they were not.

Alaska's claim that seven million additional acres became subject to the Rule refers to two changes that occurred between the DEIS and the FEIS: (1) the decision to eliminate the 2.8 million acres of IRAs that had been roaded after their designation as IRAs; and (2) the addition of 4.2 million acres that occurred after the Forest Service corrected IRA maps. AR Doc. 5091. With respect to the 2.8 million acres, the DEIS proposed excluding them from the road-building prohibition because they had become "roaded." AR Doc. 1362 (DEIS Vol. 1), at 2-13. After public comment revealed

confusion regarding the division between "roaded roadless areas" and "unroaded roadless areas," however, the USDA made the general prohibition on roadbuilding applicable across all IRAs. 66 Fed. Reg. at 3251, 3272; AR Doc. 4609 (FEIS Vol. 1), at 2-23. As such, it is clear that the Forest Service had already considered the environmental effects of applying the Roadless Rule to both roaded and unroaded portions of IRAs in the DEIS, so it did not act arbitrarily and capriciously when it chose not to prepare a supplemental EIS after it made that change in the FEIS.

The Forest Service was similarly not required to prepare a supplemental EIS when it revised the maps to include an additional 4.2 million acres in the IRAs that would be subject to the Rule. The Forest Service indicated in the proposed rule that "[p]rior to finalizing this proposed rule, map adjustments may be made for forests and grasslands currently undergoing assessments or land and resource management plan revisions," thereby increasing or decreasing the total acreage of IRAs affected. 65 Fed. Reg. at 30,279. And after making these map adjustments, the Forest Service increased the "total inventoried roadless area acreage . . . from 54.3 million acres in the DEIS to 58.5 million acres in the FEIS." AR Doc. 4609 (FEIS Vol. 1.), at 2-23; *see also id.* at 1-1 n.2. But because these additional 4.2 million acres shared the same ecological characteristics as those evaluated in the DEIS, they were still "qualitatively within the spectrum of alternatives that were discussed in the draft." 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981); *see also id.* ("If the draft EIS considered designation of a range of alternative tracts which encompassed forest area of similar quality and quantity, no supplemental EIS would have to be prepared.").

With respect to the Tongass alternative, there is nothing in NEPA that requires a supplemental EIS when an agency switches the alternative it identifies as the preferred alternative. Indeed, the Council on Environmental Quality has specifically instructed that, "[i]f [the chosen alternative] is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed." *Id.* Here, the USDA provided a range of alternatives for the Tongass in both the DEIS and the FEIS, and after engaging in the NEPA process and evaluating the public comments and impacts of the alternatives, it decided to switch its preferred alternative. *See* AR Doc. 1362 (DEIS Vol. 1), at 2-10 to 2-13; AR Doc. 4609 (FEIS Vol. 1), at 2-10 to 2-123. Importantly, the USDA disclosed in the DEIS the alternative of not exempting the Tongass, and it received public comment on this alternative. The USDA therefore was not required to prepare a supplemental EIS when it changed the preferred alternative for the Tongass.

### 2. Alaska's Challenge Pursuant to the Regulatory Flexibility Act

Although Alaska concedes that it may not bring a claim under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601–12, it argues that the USDA's disregard for the RFA concerns of the Small Business Administration ("SBA") during the rulemaking process demonstrates that the rulemaking was arbitrary and capricious. Pl.'s Mem. 34. The RFA "obliges federal agencies to assess the impact of their regulations on small businesses." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). But importantly, Alaska does not seek review of the USDA's compliance with the RFA; rather, Alaska alleges that the USDA violated NEPA by failing to disclose the position

of—and comments made by—the SBA. Pl.'s & Intervenor-Pls.' Joint Consolidated

Reply Supp. Summ. J. & in Opp'n. to Fed. Defs.' & Intervenor-Defs.' Cross Mots.

Summ. J. 12, ECF No. 81 ("Pl.'s Reply"). Specifically, Alaska asserts that the USDA

was required to disclose to the public the fact that the SBA disapproved of the

Department's efforts. *Id.* According to Alaska, the USDA violated NEPA when it did

not mention the SBA's negative opinion in the ROD. *Id.* (citing 66 Fed. Reg. at 3270–

71). I disagree.

The record makes clear that the USDA disclosed the potential impacts the Rule

would have on small businesses, as well as the SBA's views, during the NEPA process.

The USDA sought public comment on economic issues during the scoping period, and as

a result of comments concerning the economic effects on small entities, the SBA

prepared an RFA analysis that was publicly disclosed with the DEIS. *See* 64 Fed. Reg. at

56,307; AR Doc. 1362 (DEIS Vol. 1), at A-1, A-21 to A-23; AR Doc. 1350, at 11–12. In

the FEIS, the USDA included a discussion of socio-economic factors and published the

SBA's comment letter, which clearly outlined the SBA's position on the applicability of

the RFA. *See* AR Doc. 4609 (FEIS Vol. 1), at 3-264 to 3-371. Based on this record, I

find that the USDA complied with its duty—if such a duty existed[4]—to disclose the

SBA's position on the rulemaking.

---

[4] Defendants alternatively argue that they were not required to make these disclosures. Fed. Defs.' Reply
Supp. Summ. J. 13–14, ECF No. 83 ("Defs.' Reply"). Because I conclude that the disclosures were
adequate, I do not address defendants' argument on this point.

## D. Alaska's Challenges to the Roadless Rule as Applied to the Alaska National Forests

In addition to its challenges to the general rulemaking process of the Roadless Rule, Alaska levels specific challenges to the Rule as it applies to Alaska. I will address each of these arguments in turn below.

### 1. The TTRA

Alaska urges this Court to find that the Roadless Rule violates the TTRA because, "[t]hroughout the rulemaking, USDA was well aware that if the Roadless Rule was applied to the Tongass, there would be no possibility of meeting timber demand." Pl.'s Mem. 38 (citing AR Doc. 4609 (FEIS Vol. 1), at 3-378 to 3-379. Under the TTRA, the Forest Service must seek to meet market demand for timber on the Tongass National Forest. 16 U.S.C. § 539d(a). Specifically, Congress directed the Forest Service to seek to provide a supply of timber from the Tongass that would "(1) meet[] the annual market demand for timber from the forest; and (2) meet[] the market demand from the forest for each planning cycle." *Id.* Alaska and plaintiff-intervenors allege that the Roadless Rule makes "so much suitable acreage on the Tongass off limits to timber harvest" such that it is impossible to comply with the statute. Pl.-Intervenors' Br. Supp. Summ. J. 8, 10, 14 ("Pl.-Intervenors' Br."), ECF No. 73-1; Pl.'s Mem. 40-41. While plaintiff and plaintiff-intervenors are correct that the TTRA imposes additional planning requirements for the Tongass, they fail to accurately state the Forest Service's obligations under that statute. Indeed, the TTRA does *not* obligate the Forest Service to *actually meet* market demand.

36

Instead, the statute requires the Forest Service to consider and *seek* to meet market demand, consistent with its multiple-use management obligations. *See* 16 U.S.C. § 539d(a); *see also Se. Conference v. Vilsack*, 684 F. Supp. 2d 135, 138 (D.D.C. 2010) (finding that TTRA requires the Forest Service to "at least *consider* market demand and *seek* to meet market demand" (quoting *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 801 (9th Cir. 2005))). Importantly, under its multiple-use mandate, the USDA retains discretion to balance market demand for timber with other needs and, if appropriate, reach a balance among the multiple-uses that does not fully satisfy timber demand on the Tongass. *See, e.g.*, *Wind River Multiple-Use Advocates v. Epsy*, 835 F. Supp. 1362, 1372 (D. Wyo. 1993) ("Courts that have considered this issue have held that the MUSYA grants the Forest Service 'wide discretion to weigh and decide the proper uses within any area.'" (quoting *Big Hole Ranchers Ass'n v. U.S. Forest Serv.*, 686 F. Supp. 256, 264 (D. Mont. 1988))), *abrogated on other grounds by Wyo. Timber Indus. Ass'n v. U.S. Forest Serv.*, 80 F. Supp. 2d 1245 (D. Wyo. 2000). I therefore must assess whether the balance the USDA struck in promulgating the Roadless Rule conflicted with the TTRA and thus violated the APA.

As set forth in my earlier discussion of the statutory framework above, the Organic Act, the MUSYA, and the NFMA authorize and direct the Forest Service to establish and administer the national forests for multiple uses. *See* 16 U.S.C. § 551; 16 U.S.C. § 528; 16 U.S.C. § 1600. Given the competing obligations the Forest Service must balance, and the significant discretion it has to make these decisions, "the courts are reluctant to overrule its decisions" as long as "the Forest Service considers the other competing uses."

37

*Wind River Multiple-Use Advocates*, 835 F. Supp. at 1372–73 (quoting *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 592 F. Supp. 921, 938 (D. Or. 1984)); *see also Sierra Club v. Hardin*, 325 F. Supp. 99, 123 (D. Alaska 1971) ("Congress has given no indication as to the weight to be assigned each value and it must be assumed that the decision as to the proper mix of uses within any particular area is left to the sound discretion and expertise of the Forest Service.").[5]

Here, the record reveals that the USDA complied with its duty to seek to meet market demand while balancing the other competing land uses in the Tongass. The USDA performed an extensive analysis specific to the Tongass, which it did not do for any other national forest. *See* AR Doc. 1362 (DEIS Vol. 1), at 3-226 to 3-239; AR Doc. 4609 (FEIS Vol. 1), at 3-371 to 3-392; AR Doc. 6004, at 696-711; 66 Fed. Reg. at 3254–55, 3266–67, 3270. As part of this analysis, the USDA considered the timber market demand in Southeast Alaska, finding that timber harvest had fallen sharply in the prior decade. AR Doc. 4609 (FEIS Vol. 1), at 3-376 (finding that the timber industry was "undergoing a fundamental transformation"). In fact, the USDA determined that timber harvest on NFS lands in Alaska had dropped approximately 69 percent in the decade prior to the Roadless Rule. *Id.* The USDA also assessed future market demands, finding no evidence of industry-wide changes in processing efficiency that would indicate a potential future increase in market demand. *Id.* Based on its analysis, the USDA

---

[5] And the Forest Service is afforded similar discretion as to what constitutes market demand for Tongass timber. *See Se. Conference*, 684 F. Supp. 2d at 147 (noting that the Forest Service is entitled to an "extreme degree of deference" on this question (quoting *Am. Farm Bureau Fed.'n v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009))).

predicted a market demand for Tongass timber of 124 MMBF for the 10-year planning cycle. *Id.* at 3-377. After completing its assessment, the USDA disclosed that, under the Roadless Rule, the currently projected level of timber demand would not be met. *Id.* at 3-378 to 3-379; 66 Fed. Reg. at 3254. The USDA accordingly balanced the timber demand against the "extraordinary ecological values" of the Tongass and concluded that the long-term benefits of conserving IRAs on the Tongass outweighed the potential for economic harm that would result from the reduced timber harvest. 66 Fed. Reg. at 3254. To reduce the strain on the state and local economies, the USDA grandfathered in already-planned timber projects. *Id.*

Alaska hangs its hat on the fact that "when USDA chose to impose a prohibition on road construction and timber harvest in Tongass roadless areas, the agency did so with full knowledge of the TTRA consequences." Pl.'s Mem. 40. But the fact that the USDA was aware of the consequences the Roadless Rule would pose to the timber market does not "render meaningless the congressional directive on Tongass timber supply" as Alaska suggests. *Id.* at 40–41. Indeed, this Court would be more concerned if the USDA were *unaware* of the consequences of its actions, because the USDA was tasked with making an informed decision. Although Alaska is disappointed with the decision the USDA reached, there can be no doubt that the USDA considered market demand and sought to meet market demand under the TTRA while balancing its obligations to consider multiple uses under the MUSYA, the NFMA, and the Organic Act. Accordingly, I find that the Roadless Rule does not violate the TTRA.

## 2. ANILCA

Alaska next challenges the Rule on the ground that it constitutes an unlawful withdrawal of public land, in violation of ANILCA. *Id.* at 43. Section 1326(a) of ANILCA prohibits "executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska" without the approval of Congress. 16 U.S.C. § 3213. According to plaintiff and plaintiff-intervenors, the USDA's designation of 9.6 million acres of IRAs on the Tongass and 5.2 million acres of IRAs on the Chugach National Forest—another national forest in Alaska—are unlawful withdrawals under Section 1326 because the USDA did not obtain congressional approval. Pl.'s Reply 20. Defendants counter that these land designations are not withdrawals under Section 1326. Defs.' Mem. 55. Indeed, defendants note that no court has ever applied Section 1326 to invalidate a federal agency's multiple-use management decision-making, and they counsel this Court against doing so today. *Id.* at 55–56. Unfortunately for plaintiffs, defendants are correct.

Our Circuit has defined a withdrawal as an action that "exempts the covered land from the operation of public land laws." *New Mexico v. Watkins*, 969 F.2d 1122, 1124 (D.C. Cir. 1992) (citing 43 U.S.C. § 1702(j)); *see also Se. Conference*, 684 F. Supp. 2d at 143 (importing the definition of the term withdrawal in ANILCA from the Federal Land Policy and Management Act). The public land laws to which the statute refers are those that "authorize the transfer of federal lands to the private domain for private use." *Se. Conference*, 684 F. Supp. 2d at 143. Critically, the Roadless Rule does not exempt IRAs from the operation of the mineral leasing laws. Instead, the Rule restricts the terms of

40

surface occupancy of the land, which is within the USDA's authority under the mineral leasing laws. 66 Fed. Reg. at 3256. Indeed, the Rule explicitly allows for new mineral leases in IRAs, provided that there are no new roads constructed in conjunction with those new leases. *Id.* Thus, the Rule does not withdraw the IRAs from the mineral leasing laws; it regulates the IRAs within the bounds of the mineral leasing laws. And other courts have similarly held that the USDA's decision not to make certain lands available for mineral leasing is not a withdrawal. *See Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229–30 (9th Cir. 1988) ("We fail to see how a decision not to issue oil and gas leases on Deep Creek would be equivalent to a formal withdrawal."). In light of the USDA's broad discretion on this issue, I find no violation of the ANILCA.

### 3. NEPA

In addition to its general challenges to the rulemaking under NEPA, Alaska and plaintiff-intervenors raise distinct challenges to the NEPA process as the Rule applies to Alaska. I will assess each of these claims in turn below.

#### a. The Purpose and Need Statement

Plaintiff-intervenors contend that there have been three "national" and "whole picture" reviews of the Tongass (the first through ANILCA in 1980, the second through the TTRA in 1990, and the third through the Tongass Land Management ROD in 1999), and thus there was no need for another Forest Service review of Alaska's national forests in conjunction with the Roadless Rule rulemaking process. Pl.-Intervenors' Br. 24. They insist that, had the USDA disclosed these comprehensive reviews of land management on the Tongass, it would have made clear that there was no permissible purpose or need to

apply the Roadless Rule to Alaska's national forests. *Id.* Defendants counter that "neither the Tongass's unique statutory status nor its recent Forest Plan amendment demonstrate that the purpose and need for the Roadless Rule is not applicable to the Tongass." Defs.' Reply 20. On the record before me, I must agree with defendants.

While both parties acknowledge the unique status of the Tongass, the administrative record makes clear that IRAs provide the same ecological and social values on the Tongass as they do throughout the rest of the country. AR Doc. 1362 (DEIS Vol. 1), at 3-371 to 3-373. And the FEIS projected that, in the absence of the Roadless Rule, 61 miles of roads would be constructed on the Tongass by 2040. AR Doc. 4609 (FEIS Vol. 1), at 3-253. Indeed, the USDA's analysis concluded that, by applying the Rule to the Tongass, it would "greatly reduce[] much of the incremental loss of habitat and species abundance." AR Doc. 4240. Put simply, it is clear that the USDA considered the unique circumstances of the Tongass, and the USDA did not act arbitrarily and capriciously by finding that there was, in fact, a legitimate purpose and need to apply the rule to the Tongass.

### b. The Decision to Focus Mitigation Efforts on Timber

As I noted in my discussion of Alaska's challenge pursuant to the TTRA, the USDA opted to help mitigate the Roadless Rule's impact on the Tongass by allowing timber harvesting projects already planned in IRAs on the Tongass to be grandfathered in and proceed as planned.[6] Plaintiff and plaintiff-intervenors urge this Court to find that

---

[6] Plaintiff-intervenors—joined by Alaska—also challenge the USDA's decision not to issue a supplemental EIS to explain the shift among preferred alternatives for the Tongass from the DEIS to the

this mitigation was arbitrary because it did not address the negative impacts outside of the timber context, including impacts on mining, tourism, hydropower, geothermal energy, and community access. Pl.'s Reply 32. The record is clear, however, that the primary adverse consequence of the Roadless Rule on the Tongass was the potential that timber harvest would be reduced. 66 Fed. Reg. at 3254. Indeed, the USDA specifically found that there would be no meaningful adverse impacts on other resources or industries. *See* AR Doc. 4609 (FEIS Vol. 1), at 3-330 (noting that the Rule's social and economic effects would be minor outside the context of the timber industry); *see also id.* at 3-254 (finding locatable mineral exploration and development "would not be affected under these alternatives"); *id.* at 3-373 (finding that the Tongass will continue to meet recreation and tourism demand); AR Doc. 3097, at 17-18 (finding no planned geothermal projects in IRAs in Alaska and only two planned hydropower projects on the Tongass); AR Doc. 5567, at 2 (finding that the Roadless Rule would not interfere with transportation projects on the Tongass). As such, it was not unreasonable for the USDA to focus its mitigation efforts on easing the transition to a timber market not dependent on harvest from IRAs. 66 Fed. Reg. at 3254.

### c. Whether the USDA Considered the Social and Economic Impacts of the Rule as Applied to the Tongass

Finally, plaintiff and plaintiff-intervenors assert that the USDA violated NEPA by failing to consider the social and economic impacts of the Rule on various resources and

---

FEIS. *See* Pl.-Intervenors' Br. 25–28. Because I addressed and disposed of this challenge in my earlier discussion of plaintiff's and plaintiff-intervenors' general challenges to the rulemaking, above, I do not revisit these substantially similar arguments here.

industries. In particular, plaintiffs take issue with the USDA's failure to consider: (1) the Southeast Alaska Transportation Plan; (2) Executive Order 12866 and the Rule's impacts on renewable energy resources; (3) the Southeastern Alaska Intertie, which provided funds for constructing transmission lines in Southeastern Alaska; (4) the impact on geothermal resources and leasable minerals; and (5) the impact on mining. *See* Pl.-Intervenors' Br. 33–45. Upon review of the record, however, I find that the USDA adequately considered each of these concerns in its decision to apply the Roadless Rule to Alaska. *See* AR Doc. 5567, at 2 (finding that future major road transportation projects in Alaska would not be impacted by the Rule because it allows for the construction of Federal Aid Highway projects in IRAs); 66 Fed. Reg. at 3267–71 (discussing the costs and benefits of the Rule in the context of its impact on renewable energy sources, such as hydroelectric and geothermal power); AR Doc. 5567, at 2 (considering "whether roads [through IRAs] are necessary to build or maintain the intertie" and finding that they are not); AR Doc. 4609 (FEIS Vol. 1), at 3-68 to 3-69) (noting that "[p]otential near future geothermal development associated with inventoried roadless areas appears limited"); 66 Fed. Reg. at 3253 (clarifying that, under the Rule, the Forest Service will continue to provide reasonable access for the exploration and development of locatable minerals under the Mining Law of 1872). As such, Alaska's claim that the USDA violated NEPA by failing to consider the Rule's impact on these industries and resources accordingly fails.

## CONCLUSION

For the foregoing reasons, defendants' and defendant-intervenors' cross motions for summary judgment are GRANTED and plaintiff's and plaintiff-intervenors' motions for summary judgment are DENIED. Accordingly, it is hereby ORDERED that judgment be entered in favor of defendants and this case be DISMISSED WITH PREJUDICE.

An order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge